**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CURT HATCHER, derivatively on behalf of CBS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>LESLIE MOONVES, SUMNER REDSTONE, SHARI REDSTONE, DAVID R. ANDELMAN, JOSEPH A. CALIFANO, JR., WILLIAM S. COHEN, GARY L. COUNTRYMAN, CHARLES K. GIFFORD, LEONARD GOLDBERG, BRUCE S. GORDON, LINDA GRIEGO, ARNOLD KOPELSON, DOUG MORRIS, FRED SALERNO, FREDRIC G. REYNOLDS, SUSAN C. GORDON,<br><br>Defendants,<br><br>and<br><br>CBS CORPORATION,<br><br>Nominal Defendant. | Civil Action No. 09-civ-8373<br><br>ECF CASE<br><br><br><br><br><br><br><br><u>**JURY TRIAL DEMANDED**</u> |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

1.      Plaintiff Curt Hatcher ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant CBS Corporation ("CBS" or the "Company") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from February 2008 to the present (the "Relevant Period").

**NATURE OF THE ACTION**

2.      This lawsuit concerns the artificial inflation of the value of the Company's assets and income – and, in turn, its stock price -- in service of the personal financial interests of defendant Sumner M. Redstone ("Redstone"), CBS's majority shareholder and the Chairman of

its Board and the other defendants named herein.

3.      Throughout the Relevant Period – and to the present day – defendant Redstone served as Chairman of both CBS and Viacom, Inc. ("Viacom"), a related entity.  At the same time, defendant Redstone owned 80% of the shares of National Amusements Inc. ("National Amusements"), with his daughter, defendant Shari Redstone ("S. Redstone") (another board member of CBS and Viacom), owning the remaining 20% of the shares.  National Amusements, in turn, owned 79.8 % of the Class A voting shares of CBS as well as 81.6 % of the Class A voting shares of Viacom. National Amusements also owned significant amounts of those same companies' nonvoting shares.

4.      In short, as Chairman of the Board and majority owner through his control of National Amusements, defendant Redstone has "called the shots" at CBS and related entities for many years.

5.      Prior to the Relevant Period, defendant Redstone, acting on behalf of his alter-ego National Amusements, borrowed a total of $1.6 billion from various lenders.  This $1.6 billion loan included a critical covenant requiring significant principal payments on the loans if the value of the CBS and Viacom stock under National Amusement's control fell below certain levels (the "Principal Payment Covenant").  Unfortunately, neither defendant Redstone nor the other defendants disclosed the $1.6 billion debt or the Principal Payment Covenant to the market or CBS shareholders at any time prior to the Relevant Period.

6.      Instead, on or about October 2008, defendants belatedly informed the market and CBS shareholders for the first time of the existence of the debt and the Principal Payment Covenant of an enormous amount of CBS shares.

7.      It can hardly be viewed as a coincidence that upon National Amusement's

incurrence of this $1.6 billion debt, with its Principal Payment Covenant concerning CBS's stock value, defendants embarked on a campaign to artificially inflate the value of CBS stock so that defendant Redstone would not have to make mandatory principal payments to the lenders. A central aspect of this campaign was the failure of CBS to timely write down goodwill and another intangible asset, Federal Communication Commission ("FCC") licenses, to their fair values.

8.     The absolute and percentage amounts of goodwill intangibles and FCC licenses on the books of CBS had prompted some analysts to speculate, as early as May 2008 that CBS's assets were overstated by as much as $6 billion.

9.     What no one could have anticipated, however, was the staggering lengths to which defendants had carried this artifice. When defendants finally announced, on October 10, 2008, that CBS would be recognizing an impairment to its goodwill and other intangible assets, the market was stunned to learn that this write-down would be to the tune of *$14 billion.*

10.    Against this backdrop, as noted herein, during the Relevant Period, defendants repeatedly and misleadingly highlighted the "strong" and "pristine" nature of CBS's balance sheet.

11.    In truth, defendants materially overstated the Company's actual income, goodwill, and intangible assets. In fact, the magnitude of CBS's announced impairment charge – $14 billion – was equal to more than one-third of CBS's total assets and almost two-thirds of the Company's equity as of June 30, 2008.

12.    This disclosure of a $14 billion write-down came only 70 days after defendants' issuance on July 31, 2008 of a press release summarizing the Company's financial results for the second quarter of 2008, which without hesitation reported goodwill at approximately $29.2

billion.

13.     When the market learned of this $14 billion write-down in goodwill -- a decrease of over 48 percent -- the price of CBS stock plummeted by 20% in one day. Specifically, the stock price fell from $10.14 to $8.10 per share, and this latter figure represents less than one-third of the high it reached during the Relevant Period.

14.     Adherence to basic principles of GAAP required defendants to write down goodwill assets at the time they originally declined in value. Nonetheless, defendant Redstone – the Chairman and majority shareholder of CBS – would not allow the write-down at the appropriate time.

15.     Again, defendant Redstone adopted this approach because he was aware that a proper and timely disclosure of the impairment of goodwill would cause a decrease in the value of CBS stock; this development, in turn, would trigger the Principal Payment Covenant under the $1.6 billion loans to National Amusements. To, at all costs, avoid this potentially disastrous event, defendant Redstone and CBS chose to intentionally mislead the market and National Amusements' lenders.

16.     Defendants' motivation for belatedly reporting the $14 billion dollar write-down on October 10, 2008 is clear. The general market collapse during the same timeframe caused the value of defendant Redstone's (through National Amusements) stock in CBS and Viacom to fall below the levels specified in the Principal Payment Covenants for the $1.6 billion loan. With the Covenant already triggered, defendant Redstone had no choice but to sell $233 million of CBS and Viacom shares held by National Amusements to pay creditors.

17.     The game was up. Because avoidance of this eventuality was the purpose of the goodwill scam at CBS, defendant Redstone and the Company seized this moment to finally come

clean, tidy up the books at CBS, and belatedly disclose the $14 billion dollar (48 percent) write-down in goodwill.

18.     In summation, during the Relevant Period, defendants caused CBS to issue a series of materially false and misleading statements about the Company's financial condition and operating results. Specifically, defendants failed to disclose that adverse market conditions materially impaired CBS's operations and the value of its intangible assets. The value of CBS's overstated assets, which included CBS's indefinite lived intangible assets, were undeniably material, representing more than 70% of the Company's total assets and 130% of CBS's total equity at the start of the Relevant Period. Defendants' failure to timely write down the value of the Company's overstated assets caused the Company's reported operating results during the Relevant Period to be materially inflated.

19.     Accordingly, CBS has been damaged.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

21.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) CBS

maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to CBS occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

23.     Plaintiff is a current shareholder of CBS and has continuously held CBS stock since January 3, 2006.  Plaintiff is a citizen of Arizona.

24.     Nominal defendant CBS is a Delaware corporation headquartered in New York, NY.  According to its public filings, CBS, through its subsidiaries, operates as a mass media company in the United States and internationally.

25.     Defendant Leslie Moonves ("Moonves") has served as President and Chief Executive Officer ("CEO") of the Company since at least 2005.  Upon information and belief, defendant Moonves is a citizen of New York.

26.     Defendant Redstone is a founder of the Company and has served as Executive Chairman of the Board since 2005.  Upon information and belief, defendant Redstone is a citizen of New York.

27.     Defendant S. Redstone has served as Vice Chair of the Board since 2005 and as a director of the Company since 1994.  Upon information and belief, defendant S. Redstone is a citizen of New York.

28.     Defendant David R. Andelman ("Andelman") has served as a director of the

Company since 2000.    Upon information and belief, defendant Andelman is a citizen of Massachusetts.

29.    Defendant Joseph A. Califano, Jr. ("Califano") has served as a director of the Company since 2003.  Upon information and belief, defendant Califano is a citizen of New York.

30.    Defendant William S. Cohen ("Cohen") has served as a director of the Company since 2003.  Upon information and belief, defendant Cohen is a citizen of Maine.

31.    Defendant Gary L. Countryman ("Countryman") has served as a director of the Company since 2007.    Upon information and belief, defendant Countryman is a citizen of Massachusetts.

32.    Defendant Charles K. Gifford ("Gifford") has served as a director of the Company since 2006.    Upon information and belief, defendant Gifford is a citizen of Massachusetts.

33.    Defendant Leonard Goldberg ("Goldberg") has served as a director of the Company since 2007.    Upon information and belief, defendant Goldberg is a citizen of California.

34.    Defendant Bruce S. Gordon ("Gordon") has served as a director of the Company since 2006.  Upon information and belief, defendant Gordon is a citizen of New Jersey.

35.    Defendant Linda Griego ("Griego") has served as a director of the Company since 2007.  Upon information and belief, defendant Griego is a citizen of California.

36.    Defendant Arnold Kopelson ("Kopelson") has served as a director of the Company since 2007.    Upon information and belief, defendant Kopelson is a citizen of California.

37.     Defendant Doug Morris ("Morris") has served as a director of the Company since 2007.  Upon information and belief, defendant Morris is a citizen of New York.

38.     Defendant Fred Salerno ("Salerno") has served as a director of the Company since 2007.  Upon information and belief, defendant Salerno is a citizen of New York.

39.     Defendant Fredric G. Reynolds ("Reynolds") served as Chief Financial Officer ("CFO") of the Company from 2006 until his "retirement" in June 2009.  Upon information and belief, defendant Reynolds is a citizen of New York.

40.     Defendant Susan C. Gordon ("Gordon") served as Senior Vice President, Controller and Chief Accounting Officer of the Company from 2005 until she left the Company in August 2009.   Upon information and belief, defendant Gordon is a citizen of New York.

41.     Collectively, defendants Moonves, Redstone, S. Redstone, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, Gordon, Griego, Kopelson, Morris, Salerno, Reynolds, and Gordon shall be referred to herein as "Defendants."

42.     Collectively, defendants Countryman, Califano, Griego, Morris, and Salerno shall be referred to as the "Audit Committee Defendants."

### DEFENDANTS' DUTIES

43.     By reason of their positions as officers, directors, and/or fiduciaries of CBS and because of their ability to control the business and corporate affairs of CBS, Defendants owed CBS and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage CBS in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of CBS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to CBS and its

shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.     Defendants, because of their positions of control and authority as directors and/or officers of CBS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with CBS, each of the Defendants had knowledge of material non-public information regarding the Company.

45.     To discharge their duties, the officers and directors of CBS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.   By virtue of such duties, the officers and directors of CBS were required to, among other things:

    a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

    c.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

46.     Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a.   Review and discuss the annual audited financial statements and quarterly financial statements with management;

    b.   Discuss earnings press releases;

c. Discuss with management all critical accounting policies and practices to be used by the Company and all alternative treatments of financial information within GAAP;

d. Review the effectiveness of the Company's disclosure controls and procedures;

e. Review with management important trends and developments in financial reporting practices and requirements;

f. Review the quality, adequacy, and effectiveness of the Company's internal control over financial reporting;

g. Review with management any legal matters that may have a material impact on the Company; and

h. Review the adequacy and effectiveness of the Company's procedures to ensure compliance with its legal and regulatory responsibilities.

## SUBSTANTIVE ALLEGATIONS

### The Company

47.     On December 31, 2005, the entity formerly known as Viacom Inc. (the "former Viacom") was separated (the "Separation") into two publicly traded entities, the former Viacom, which was renamed CBS and which continues as the surviving entity, and the new Viacom Inc. The Separation has been accounted for by CBS as a spin-off.

48.     CBS operates via the following major business segments: Television, Radio, Outdoor, and Publishing. The Television segment consists of: CBS Television comprising CBS Television Networks, the 30 owned broadcast television stations; CBS Paramount Network Television and CBS Television Distribution, the television production and syndication operations; Showtime Network, a premium subscription television program service; and CBS College Sports Network, the cable network and online digital media business to college athletics. The Radio segment owns and operates 140 radio stations in the United States.  It provides a range of programming formats, such as rock, oldies, all-news, talk, adult contemporary,

sports/talk, and country through CBS Radio.   The Outdoor segment displays advertising on

media, including billboards, transit shelters, buses, rail systems, mall kiosks, and stadium signage

through CBS Outdoor and in retail stores through CBS Outernet.   The Publishing segment

publishes and distributes consumer books under imprints, such as *Simon & Schuster, Pocket*

*Books, Scribner,* and *Free Press*.

### Defendants' False and Misleading Statements During the Relevant Period

49.     On February 26, 2008, Defendants caused CBS to issue a press release

announcing its financial results for the fourth quarter and year end of 2007, the period ended

December 31, 2007:

**CBS CORPORATION REPORTS FOURTH QUARTER AND FULL YEAR
2007 RESULTS**

Fourth Quarter OIBDA Up 4% to $824 Million Full Year OIBDA Up 1% to
$3.08 Billion

Fourth Quarter Operating Income Up 3% to $705 Million Full Year Operating
Income Up 1% to $2.62 Billion

Fourth Quarter Adjusted Diluted EPS Up 2% to $.54 Full Year Adjusted Diluted
EPS Up 9% to $1.88

Fourth Quarter Free Cash Flow Up $137 Million to $122 Million Full Year Free
Cash Flow Up 6% to $1.71 Billion

50.     Defendant Moonves commented on the results stating in pertinent part as follows:

We finished 2007 with our businesses well poised to increase revenues and profits
in 2008 and beyond. In Television, I'm particularly pleased with the recent
resolution of the WGA strike, which has restored stability to the network season.
Meanwhile, Outdoor and Publishing had exceptionally strong performances for
the year, with Outdoor picking up momentum to deliver a strong double-digit
OIBDA gain in the fourth quarter.

Our businesses produced a significant amount of free cash flow and, during the
year, we returned $4 billion of cash to shareholders through a combination of
dividends and share repurchases. At the same time, we used a prudent portion of
our cash to invest in higher-growth properties like the online social networking
community Last.fm and digital outdoor displays both domestically and overseas.

51.     Following the issuance of the press release, Defendants held a conference call

with analysts and investors to discuss the earnings release and the Company's operations. During the conference call, defendant Moonves spoke positively about the Company's financial results stating in pertinent part as follows:

> I'm very pleased with our solid results in the fourth quarter and our entire second year as the new CBS Corporation. This morning I'm going to talk a little about our financial performance and briefly walk through some key issues regarding our business and then my colleague Fred Reynolds will cover our financials in greater depth.
>
> First, I want to highlight our results OBIDA, operating income, EPS and in free cash flow which we believe is one of the most significant measures of our success. OBIDA was up 4% to $824 million in the fourth quarter as well as being up 1% to $3.08 billion for the year. Operating income was also up 3% to $705 million for the quarter and also up 1 % for the year to $2.62 billion. 2007 adjusted diluted EPS from continuing operations increased 9% to $1.88 for the year. Fourth quarter was up 2% to $0.54 due to the impact of our 2007 share repurchase program and limited by a higher effective tax rate. At the same time 2007 free cash flow was up 6% to $1.71 billion dollars and in the fourth quarter free cash flow increased $137 million from a -$15 million last year to come in at $122 million. Year after year we continue to produce excellent pre-cash flow. It is this cash that will enable us to invest in our asset portfolio for future growth, continue to return dividends to our investors and maintain an extremely healthy balance sheet.
>
> Through a number of transactions in 07 we ended the year with a portfolio that is well positioned to grow in 08 and beyond. We are truly excited about the prospects of each one of our businesses. At our heart we remain a content company across all our operations. It is the content that is the engine driving us forward into the digital interactive future. The center of the content engine remains the CBS Television Network. The network business remains the greatest mass media option available to audiences and advertisers and what is not really recognized yet is that the content on network TV is also defining success online and on all the emerging platforms now available to consumers. As a matter of fact, content from across the entire company is pushing us forward into the interactive marketplace. CBS Paramount Network Television and CBS Television Distribution continue to supply industry leading programming on our network, stations across America and our growing list of online outlets and Showtime which is having its best run ever both creatively, financially and obviously with a great increase in subscribers began the year with six of the top 10 selling shows on iTunes. In short, the new media business now taking shape is being built on the foundation of our established ones to the benefit of both.
>
> *       *       *
>
> Next, I'd like to talk about the recently concluded writer's strike. It lasted longer than any of us would have liked but the good news is the network business is back. We've got a full slate of new programming starting in the spring and once again we'll be presenting to advertisers at Carnegie Hall in May. As we predicted CBS sustained itself very well during the strike in fact, in the short term we were able to manage operating costs at the network very effectively. This was primarily

achieved by significantly reducing our programming expenses and the termination of costly writing and producing contracts. Our financial picture was not affected negatively by the strike in any shape or form. Perhaps most importantly many of the economic benefits we were able to achieve during the strike has changed the way we do business and will allow us to operate more efficiently going forward.

\*    \*    \*

Second, we are in the beginning of an unprecedented election year. We're already seeing record spending with the expectation it will continue all year long.

\*    \*    \*

Those are just some of the highlights from our businesses. Across the board you can see that we begin 08 in great shape. We've pruned our asset mix to shed some of our lower growth businesses like certain small market TV and radio stations. We've used a portion of the proceeds to invest in other higher growth areas like Last.fm which in January announced deals with all four major record labels to stream music online for free and has posted a 92% increase in US listening since that time and we're beginning to monetize those results now. As well, we've invested in more than a dozen interactive properties. We've maintained a pristine balance sheet with a sizeable cash balance allowing us to pay out a very strong dividend that now stands at $1.00 per share annually and enables us to be very nimble so that we can take advantage of any content or Internet opportunity that may present itself. Few companies in our space have the resources at their fingertips in this marketplace to be able to act as we can on opportunities in these areas. We are using our established businesses as content engines that fuel the Internet and all of the new platforms afforded by technology as well as continuing to run our core businesses at the very top levels. As a result, we are well positioned to grow revenues and profits in 08 and beyond.

52.    Defendant Reynolds added:

So, to wrap up the fourth quarter and all of 2007, we successfully strengthened our portfolio by divesting the, for very attractive values, lower margin slower growth businesses. We returned over $4 billion of cash to our shareholders, delivered on our profit growth expectations and we leave 2007 with, as Leslie just said, with a very strong balance sheet which has the capacity to both fund investments and initiatives to increase our profit growth going forward and to return cash to shareholders.

For 2008 we expect as we said in the earnings release today that our operating income before depreciation and amortization and operating income to grow between 3 and 5% over 2007 results excluding stock-based compensation expense. We are forecasting 2007 stock-based compensation expense to amount to $155 million to $165 million this year. We expect our effective income tax rate should be between 38% and 38.5% excluding any potential gains or losses on the sale of assets. We expect capital spending to be between $500 million and $550 million in 2008.

53.    On or about February 28, 2008, Defendants caused CBS to file its Form 10-K for the year ended December 31, 2007 with the SEC, which was signed by defendants Redstone,

- 13 -

Moonves, Reynolds and Gordon, confirming the financial results for the 2007 fourth quarter and year end previously announced in the press release. Additionally, the 2007 Form 10-K reported goodwill of $18.452 billion, intangible assets of $10.081 billion, total assets of $40.43 billion, stockholders' equity of $21.477 billion, noncurrent deferred income taxes of $1.947 billion and net earnings of $1.247 billion.

54.    Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, CBS's Form 10-K for the fiscal year 2007 contained sworn certifications ("SOX Certifications"), signed by defendants Moonves and Reynolds, that attested to the effectiveness and accuracy of the Company's internal controls over financial reporting. In relevant part, defendants Moonves and Reynolds each certified that:

1.    I have reviewed this annual report on Form 10-K of CBS Corporation;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial

statements for external purposes in accordance with generally accepted accounting principles;

c.    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

55.    Furthermore, as part of CBS's 2007 10-K, defendants Moonves, Reynolds and Gordon executed a report on Internal Control Over Financial Reporting, which provides in relevant part:

Management is responsible for establishing and maintaining adequate internal control over financial reporting and for the effectiveness of internal control over financial reporting, as such term is defined in Rule 13a-15(f) or Rule 15d-15(f) of the Exchange Act. Our internal control over financial reporting includes those policies and procedures that (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and disposition of assets; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures are being made only in accordance with authorizations of management and the directors of the Company; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements prepared for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal

control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2007 based on the framework set forth in Internal Control —Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2007.

56.    The statements referenced above were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts which were known to Defendants or recklessly disregarded by them:

   a. that the Company's reported goodwill and intangible assets, which ranged between 69% - 73% of CBS's total assets and 131% - 137% of CBS's total equity during the Relevant Period, were materially overstated;

   b. that the Company reported equity capital during the Relevant Period that was materially overstated;

   c. that, as a result of its failure to timely write-down impaired intangible and goodwill assets, the Company's financial results during the Relevant Period were materially overstated;

   d. that the Company's financial statements were not prepared in accordance with GAAP and, therefore, were materially false and misleading as detailed further herein;

   e. that the impairment charges were understated, and goodwill, intangible assets, total assets, stockholders equity, net income and deferred income and taxes were overstated;

   f. that the Company failed to develop and implement adequate internal

accounting controls sufficient to insure that the Company's financial results were accurately reported;

g. that the Company's balance sheet was not "pristine," "extremely strong" or "extremely healthy;" and

h. that the Defendants failed to disclose that Redstone's controlling interest of CBS common stock (via National Amusements) was the subject of the Principal Payment Covenant or the associated risks related thereto.

57. On April 29, 2008, Defendants caused CBS to issue a press release announcing its financial results for the first quarter of 2008, the period ended March 31, 2008:

### CBS CORPORATION REPORTS FIRST QUARTER 2008 RESULTS

Net Earnings Up 14% to $244 Million

Diluted EPS Up 29% to $.36

Free Cash Flow Up 25% to $938 Million

Adjusted OIBDA and Operating Income Up 10% and 11%

Company Raises Quarterly Dividend by 8% to $.27 Per Share

58. Defendant Moonves, commenting on the results, stated:

I'm very pleased with the operating performance of the Company, which produced terrific first quarter free cash flow of $938 million and diluted EPS of $.36. As a result of our continued confidence in our businesses, we are increasing our quarterly dividend by 8% to $.27 per share, paying among the highest dividends in the industry. Driving the Company's performance this quarter was significant profit improvement at Television, led by a new distribution arrangement for our valuable CSI franchise in international markets.

We also continued to drive digital operations forward, nearly doubling our online revenues for March Madness on Demand. At Radio, we are seeing positive signs early in the second quarter with sales pacing up over last year in some of our larger markets. And our recent acquisition of the largest outdoor company in South America adds to CBS Outdoor's portfolio of fast-growing attractive billboard markets.

59. Following the issuance of the April 29, 2008 press release, Defendants held a conference call with analysts and investors to discuss the earnings release and the Company's

operations.   Defendant Moonves spoke positively about the Company's business, stating in

pertinent part as follows:

> Across the board, our businesses posted operating results that led to very
> substantial free cash flow of $938 million for the quarter, up 25% versus the prior
> year period. This is the highest quarterly free cash flow since the separation.
> Going forward, we are as confident as ever about our ability to produce strong
> free cash flow. As a result, we are increasing our dividend again today by $0.02 to
> $0.27 per share. This is the sixth time in nine quarters that we've raised the
> quarterly dividend, bringing it to an annualized $1.08 per share.
>
> In the midst of challenging economic times, this move is a clear signal that we
> believe in the breadth of our businesses and their ability to perform in any climate
> now and in the future. CBS pays amongst the highest dividends in the industry
> and this increase is a strong reminder that we are fully committed to returning
> value to our shareholders.
>
> As we continue to increase the dividend, we also continue to maintain a very, very
> strong balance sheet. We have plenty of cash to invest in our businesses and to
> make smart, opportunistic acquisitions. As you know, we are looking to create
> and acquire higher growth, higher margin businesses in three key areas. The first
> area is content, which of course is the core of what we do. The second is
> interactive and the third is outdoor, particularly digital and international outdoor,
> both of which continue to grow.
>
> *     *     *
>
> Now I would like to take a few minutes to address our business portfolio and
> several key themes that speak to our solid performance in the quarter and some of
> what we are seeing in Q2 as well. Let's begin with the television segment, which
> not only grew its revenues during the quarter but also posted a 13% increase in
> OIBDA and a 15% increase in operating income. Of course, the engine that drives
> so much of our success from the station to syndication to DVD sales to online is
> the CBS Television Network. The key question during the strike was how will
> CBS rebound when original programming returns to the air? Would the viewers
> come back and the answer for us is clearly yes.
>
> *     *     *
>
> In conclusion, I am very pleased indeed with the results we are reporting today
> and with CBS' prospects going forward. We have once again delivered our
> promises while positioning the company for future growth and margin expansion.
> In the face of the current headwinds, we will continue to closely monitor the way
> in which we operate each of our businesses.
>
> We know how to run our businesses effectively regardless of the economic
> climate. We believe that in a tight market, advertisers will continue to be drawn to
> our world-class assets. From television's mass reach to radio's targeted cost-
> effectiveness to outdoor's increasingly attractive possibilities, we are a must-buy
> across the board and our ability to serve advertisers with each of these media
> improves every day with the advent of digital technology. The CBS Corporation
> clearly has the right broad range of assets to produce outstanding free cash flow

quarter after quarter, year after year. We will continue to use that cash to grow our businesses, to make opportunistic investments both internally and externally, and return value to our shareholders.

60.    Defendant Reynolds added:

. . . [O]ur broad base of media businesses produced solid results in the first quarter of 2008, driving very strong earnings per share and free cash flow growth. Let me now provide you with some financial highlights and additional information on our first quarter performance.

As Leslie said, diluted earnings per share for the first quarter was $0.36, up from $0.28 last year at this time, a 29% increase. Now, on an adjusted basis excluding stock-based compensation expense, a restructuring charge of $45 million, and the after-tax effect of station divestitures last year, earnings per share was up about 23% over the first quarter of 2007. Free cash flow for the first quarter of 2008 was a very strong $938 million, up 25% over last year's very strong free cash flow.

*        *        *

So to wrap up 2008's first quarter, our balance sheet remains very strong with over $2.3 billion of cash on the balance sheet, and with our debt to EBITDA leverage at 2.1 times, we remain at the conservative end of leverage. Today's announcement to raise our dividend by $0.02 to $0.27 a quarter signals our continued confidence in the strength of our cash flows. We also as you noted today in the earnings announcement reaffirmed our business outlook for 2008, which is for our OIBDA and operating income to grow between 3% and 5% over 2007.

61.    On or about May 2, 2008, Defendants caused CBS to file its Form 10-Q for the quarter ended March 31, 2008 with the SEC, which was signed by Reynolds and Gordon and confirmed the previously announced financial results for the 2008 first quarter. Additionally, the Form 10-Q reported goodwill of $18.481 billion, intangible assets of $9.961 billion, total assets of $41.031 billion, stockholders' equity of $21.677 billion, noncurrent deferred income taxes of $2.012 billion and net earnings of $244 million.

62.    The Company's Form 10-Q for the quarter ended March 31, 2008 also contained SOX Certifications similar to those discussed above, which were signed by defendants Moonves and Reynolds.

63.    On July 31, 2008, Defendants caused CBS to issue a press release announcing its financial results for the second quarter of 2008, the period ended June 30,

2008:

### CBS CORPORATION REPORTS SECOND QUARTER 2008 RESULTS

Revenues Up 1% to $3.4 Billion

Net Earnings Up 1% to $408 Million

Diluted EPS Up 11% to $.61 Per Share

First Half Free Cash Flow of $1.4 Billion Up 6%

Free Cash Flow of $464 Million For the Quarter

Company to Divest 50 Mid-size Market Radio Stations

64.    In the press release, defendant Moonves commented on the results stating in pertinent part as follows:

> We've taken key steps to position our asset portfolio for superior long-term growth. During the quarter, we completed our acquisition of CNET Networks, which we believe will add at least two percentage points to our revenue and profit growth rates going forward, in addition to being accretive to earnings and free cash flow in 2008. We also closed on our acquisition of IOA, the largest outdoor business in the vibrant South American market. Both of these growing businesses exemplify our strategy to increase our presence in the areas of highest potential. At the same time, we have taken this opportunity to change our portfolio by initiating a plan to divest 50 midsize market radio stations. By selling selected stations in these markets we can focus on the larger market stations, many of which are showing growth.
>
> In a more difficult economic environment, with our local businesses affected by an advertising slowdown, we have taken aggressive cost reduction actions to manage expenses. Since the beginning of the year, well before the current softness in the marketplace, we have been working to rationalize the cost structure in our Television, Radio and Outdoor businesses. When the marketplace comes back, we will be well prepared to capitalize on that upturn.
>
> Finally, I'm pleased that we have maintained our ability to grow revenues and generate strong free cash flow of more than $1.4 billion in the first half of 2008, up 6% over the first half of 2007. Free cash flow is an extremely important way that we measure our success. It has enabled us to raise our dividend again during the quarter - the sixth time since the start of 2006. This is our way of demonstrating confidence in our ability to keep generating healthy free cash flow, and our commitment to returning value to shareholders.

65.    Following the issuance of the press release, Defendants held a conference call with analysts and investors to discuss the earnings release and the Company's operations. Defendant Moonves spoke positively about the Company's business, stating in pertinent part as

follows:

The company delivered revenues of $3.4 billion in the second quarter, up 1% from the same quarter last year, which we consider quite an achievement in today's economy. Top-line highlights from the quarter include strong performances from our international syndication businesses and our Outdoor businesses where we had revenue growth both in North America and abroad. At the same time, we are clearly challenged by the economic conditions affecting many industries, particularly as it pertains to our local businesses. This is affecting sales as well as OIBDA and operating income, both which were down from last year on the quarter.

We posted an increase, however, in net income, helped by the sale of our stake in the Sundance Channel. And because of our stock buy back in the past year, our diluted EPS was up 11% to $0.61 versus $0.55 for the same period last year. What I'm most proud of is the fact that, even as we deal with the current environment and invest for growth, we continue to throw off very healthy levels of cash.

Free cash flow of $464 million in the second quarter, and $1.4 billion in the first half, up 6% from first half of 2007. This enables us to pay our very attractive dividend of $0.27 per share, and we have a strong balance sheet and sufficient cash on hand to not only continue to pay and grow our dividend, but also to manage our businesses effectively and keep investing for future growth.

*     *     *

And finally, we raised our dividend again in the quarter, our sixth increase in 2.5 years. We were able to take this action because of our strong free cash flow. Free cash flow is one of the most important ways that we measure our success and at a time, when other companies are cutting or suspending their dividends, as they try to shore up their balance sheet, we will continue paying and increasing our dividends.

We feel very good about our ability to keep generating healthy cash flow and return value to shareholders. These key strategic actions, shedding slower growth businesses to focus on higher growth areas, greatly reducing expenses and returning value to shareholders with attractive dividends, are the ways we can continue to deliver on our promise and position CBS for superior long term performance. Our company is in good shape today, even with this economy and through these actions we will be in even better shape going forward.

*     *     *

In conclusion, from TV, to radio, to Outdoor, to Publishing, to Interactive, I believe we are taking the right steps to perform well in the current environment, and position our company for impressive long-term growth. We are adjusting our asset portfolio, shedding slower-growth assets like mid-market radio stations, and acquiring businesses in higher growth areas like CNET and IOA. At the same time we are being very disciplined in cutting costs, continuing and in certain cases, accelerating efforts begun early this year, long before market conditions became evident.

Finally we are staying focused on our shareholders, our businesses continue to generate strong free cash flow, and we are committed to paying very attractive dividends and looking at the potential of a share buy back. Yes, the economy is tough right now. But we are managing our businesses effectively, focusing on improving both efficiency and growth. And as soon as the marketplace improves, we are going to be ready and in a position that capitalizes on the upturn.

66.    Defendant Reynolds added:

Our balance sheet remains very, very strong. Our leverage is at the low end of the conservative range, which we believe is prudent given the overall US economic environment and the somewhat fragile state of the credit markets. As Leslie mentioned, we are committed to returning value to shareholders. Since the second quarter 2007, we have raised our dividend 23% from $0.22 a share per quarter to the current $0.27. We believe dividend increases best signaled our confidence in our ability to produce strong free cash flow in the future, coupled with maintaining a very strong balance sheet.

                    *        *        *

Finally, as you'll note in today's earnings release we have updated our business outlook for 2008. We expect to grow adjusted operating income before depreciation and amortization low single digit over 2007, with operating income comparable to a year ago. Our outlook excludes the growth and operating income before depreciation amortization that we expect from the acquisition of CNET to provide, and excludes the impact of the additional station divestitures, which we just mentioned. While the US economy has slowed since the first quarter, largely affecting our local businesses, we have taken numerous actions to lower our operating cost and we will continue to look for opportunities to reduce cost, but also invest in businesses we believe will add to profit growth both today and into the future. We are very focused on managing our businesses through this economy and we believe the various actions that we've taken will produce even stronger profit margins and higher growth in the future.

67.    On or about August 1, 2008, Defendants caused CBS to file its Form 10-Q for the quarter ended June 30, 2008 with the SEC, which was signed by defendants Reynolds and Gordon and confirmed the previously announced financial results for the 2008 second quarter. Additionally, the Form 10-Q reported goodwill of $20.134 billion, intangible assets of $9.943 billion, total assets of $41.248 billion, stockholders' equity of $21.927 billion, noncurrent deferred income taxes of $1.885 billion and net earnings of $408 million.

68.    The Company's Form 10-Q for the quarter ended June 30, 2008 contained SOX Certifications similar to those discussed above, which were made by defendants Moonves and Reynolds.

- 22 -

## The Truth Begins to Emerge

69.     On October 10, 2008, a mere 70 days after their previous glowing report,

Defendants caused CBS to issue a press release announcing that the Company "expects to incur a

non-cash impairment charge of approximately $14 Billion, in the third quarter of 2008."

According to the press release:

> The continued economic slowdown in the United States has adversely affected
> advertising revenues across the Company's businesses, primarily at the local level
> and the effects of the current financial crisis are likely to cause further declines in
> advertising spending. As a result of these market conditions, the Company is
> revising its 2008 full year business outlook for both adjusted operating income
> before depreciation and amortization ("OIBDA") and adjusted operating income
> to a decline of mid-teens versus 2007.

> The Company said that, based on preliminary information, its third quarter
> performance is expected to reflect revenue growth of approximately 3% over the
> comparable period last year, led by higher syndication revenue and recent
> acquisitions. Further, the Company now expects to report adjusted diluted earning
> per share of approximately $.42 to $.44 for the third quarter of 2008, compared to
> $.51 for the third quarter of 2007.

> In addition, as a result of these recent adverse market conditions, the Company is
> currently performing an interim impairment test on its existing goodwill, other
> indefinite lived intangible asset balances and investments. Based on preliminary
> results, the Company expects to incur a non-cash impairment charge of
> approximately $14 Billion, in the third quarter of 2008 to reduce the carrying
> value of goodwill intangible assets related to FCC licenses and investments.

> The Company's business outlook excludes stock-based compensation expense
> restructuring charges, impairment charges and the impact of acquisitions and
> dispositions.

> The Company continues to generate significant free cash flow and expects to
> maintain its current dividend policy.

70.     In response to this announcement, the price of CBS stock declined over 20% in

one day, from $10.14 per share to $8.10 per share, on very heavy trading volume.

71.     On or about February 25, 2009, Defendants caused CBS to file its Consolidated

Statement of Operating for 2008 in a Form 10-K reporting revenues of $13.95 billion, which was

only $122 million less than 2007 (a decline of less than 1%). Cash flow from continuing

operations for 2008 was $2.147 billion compared to net cash flow from continuing operations of

$2.18 billion for 2007 and $2.003 billion for 2006.

72.     Next, on April 24, 2009, Defendants caused CBS to file its Form 14A and for the first time in a public filing disclosed the fact that the CBS common stock owned by National Amusements (for the benefit of defendant Redstone) was related in any manner to the National Amusements Principal Payment Covenant.

> Mr. Redstone is the beneficial owner of the controlling interest in National Amusements and, accordingly, beneficially owns all such shares. NAIRI is a wholly owned subsidiary of National Amusements. Based on information received from National Amusements, the Company expects that all or substantially all of the Company shares owned by NAIRI will be pledged to National Amusement's lenders in connection with the agreement to restructure National Amusement's indebtedness.

73.     Finally, on June 22, 2009, Defendants caused the Company to issue a press release announcing the purported "retirement" of defendant Reynolds:

> Fred Reynolds, Executive Vice President and Chief Financial Officer of CBS Corporation (NYSE: CBS.A and CBS), announced today that, after a distinguished 38-year career in finance and business strategy, he will retire from the Company effective August 15, 2009.
>
> *     *     *
>
> Reynolds will step down from his position as Chief Financial Officer effective July 20. Upon stepping down from that post on that date, he will continue to hold his office of Executive Vice President, working with Moonves and senior management on the coordination of the transition of his various duties, as well as on various other operational projects before his retirement on August 15.

## DERIVATIVE AND DEMAND ALLEGATIONS

74.     Plaintiff brings this action derivatively in the right and for the benefit of CBS to redress the breaches of fiduciary duty and other violations of law by Defendants.

75.     Plaintiff will adequately and fairly represent the interests of CBS and its shareholders in enforcing and prosecuting its rights.

76.     The Board currently consists of the following fourteen (14) directors: Moonves, Redstone, S. Redstone, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, Gordon, Griego, Kopelson, Morris, and Salerno.  Plaintiff has not made any demand on the present Board

to institute this action because such a demand would be a futile, wasteful and useless act, for the

following reasons:

    a.   During the Relevant Period, defendants Countryman, Califano, Griego, Morris, and Salerno served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are charged with reviewing the Company's quarterly and annual financial statements and press releases. In addition, the members of the Audit Committee are responsible for reviewing the adequacy of the Company's internal controls and the Company's compliance with legal and regulatory responsibilities. Defendants Countryman, Califano, Griego, Morris, and Salerno breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee permitted the above false and misleading statements to be made and failed to ensure that an adequate system of internal controls was in place at CBS. Therefore, defendants Countryman, Califano, Griego, Morris, and Salerno face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

    b.   The principal professional occupation of defendant Moonves is his employment with CBS as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensation and other valuable benefits. Thus, defendant Moonves lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

    c.   The principal professional occupation of defendant Redstone is his employment with CBS as its Executive Chairman, pursuant to which he has received and continues to receive substantial monetary compensation and other valuable benefits. Thus, defendant Redstone lacks independence, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

    d.   Due to their close familial and business relationships with each other, defendants Redstone and S. Redstone are incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action against each other. Defendant S. Redstone is defendant Redstone's daughter. Thus, defendants Redstone and S. Redstone lack independence; and

    e.   All of the Board members are interested because they engaged in conduct which is not protected by the business judgment rule in connection with their decision to permit defendant Reynolds to "retire" when the Board had grounds to terminate him "for cause." The Board clearly had grounds to terminate Reynolds for cause given the serious accounting improprieties that occurred while he was serving as CFO and instead they allowed him to "retire," essentially bestowing gifts on him pursuant to the terms of his employment

agreement with the Company, which was a waste of corporate assets. This Board decision is not a protected business judgment. Thus, demand is excused.

## COUNT I
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78.     As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that CBS disseminated accurate, truthful and complete information to its shareholders.

79.     Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to CBS shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

80.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

81.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

82.     As alleged herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the

misconduct and prevent its recurrence.

83.     Defendants willfully ignored the obvious and pervasive problems with CBS's internal controls practices and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

84.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

85.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

86.     Defendants owed and owe CBS fiduciary obligations.   By reason of their fiduciary relationships, Defendants specifically owed and owe CBS the highest obligation of good faith, fair dealing, loyalty and due care.

87.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

88.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, CBS has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

89.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

90.     Plaintiff, on behalf of CBS, has no adequate remedy at law.

## COUNT IV
### AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

91.     Plaintiff incorporates by reference and realleges each and every allegation set

forth above, as though fully set forth herein.

92.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of CBS.

93.     Plaintiff, as a shareholder and representative of CBS, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**COUNT V**
**AGAINST ALL DEFENDANTS FOR ABUSE OF CONTROL**

94.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

95.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CBS, for which they are legally responsible.  In particular, Defendants abused their positions of authority by causing or allowing CBS to misrepresent material facts regarding its financial position and business prospects.

96.     As a direct and proximate result of Defendants' abuse of control, CBS has sustained significant damages.

97.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

98.     Plaintiff, on behalf of CBS, has no adequate remedy at law.

**COUNT VI**
**AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT**

99.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

100.     Defendants had a duty to CBS and its shareholders to prudently supervise,

manage and control the operations, business and internal financial accounting and disclosure controls of CBS.

101.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of CBS in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of CBS's affairs and in the use and preservation of CBS's assets.

102.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused CBS to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to CBS, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged CBS.

**COUNT VII**
**AGAINST ALL DEFENDANTS FOR WASTE OF CORPORATE ASSETS**

103.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

104.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused CBS to incur (and CBS may continue to incur) significant legal liability and/or legal costs to defend itself as a result of Defendants' unlawful actions.

105.    As a result of this waste of corporate assets, Defendants are liable to the Company.

106.    Plaintiff, on behalf of CBS, has no adequate remedy at law.

## COUNT VIII
**AGAINST DEFENDANTS MOONVES, REDSTONE, S. REDSTONE, ANDELMAN, CALIFANO, COHEN, COUNTRYMAN, GIFFORD, GOLDBERG, GORDON, GRIEGO, KOPELSON, MORRIS, AND SALERNO FOR BREACH OF FIDUCIARY DUTIES OF LOYALTY AND GOOD FAITH IN CONNECTION WITH REYNOLDS' "RETIREMENT"**

107.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

108.    Each director on the Board was required to act with the utmost loyalty and good faith to the Company.  As alleged in detail herein, defendants Moonves, Redstone, S. Redstone, Andelman, Califano, Cohen, Countryman, Gifford, Goldberg, Gordon, Griego, Kopelson, Morris, and Salerno violated these core duties by allowing Reynolds to "retire" even though they had grounds to terminate him for cause.

109.    As a direct and proximate result of the Board's foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing CBS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and

develop and implement procedures for greater shareholder input into the policies and guidelines of the Board

C.      Awarding to CBS restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: October 2, 2009                    **HARWOOD FEFFER LLP**

ROBERT I. HARWOOD
DANIELLA QUITT
488 Madison Avenue, 8th Floor
New York, NY 10016
Telephone: (212) 935-7400
Facsimile: (212) 753-3630


**THE WEISER LAW FIRM, P.C.**
ROBERT B. WEISER
BRETT D. STECKER
JEFFREY J. CIARLANTO
121 N. Wayne Avenue, Suite 100
Wayne, PA 19087
Telephone:  (610) 225-2677
Facsimile:  (610) 225-2678

**GLANCY BINKOW & GOLDBERG LLP**
RICHARD A. MANISKAS
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (301) 201-9160

Counsel for Plaintiff

<u>**VERIFICATION**</u>

I, Curt Hatcher, hereby declare, under penalty of perjury, as follows:

I am the Plaintiff in the above-captioned action.  I have read the foregoing Complaint and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.

DATED:  10 / 01 / 09

Curt Hatcher